# UNITED STATES DISTRICT COURT
for the
EASTERN DISTRICT OF TENNESSEE

)
RICHARD L. LAMBERT,                                    )
929 Gregg Road                                         )
Friendsville, Tennessee 37737                          )
                                                       )
          Plaintiff *Pro Se*                           )
                                                       )
v.                      .                               )
                                                       )
THE UNITED STATES;                                     )
                                                       )
ATTORNEY GENERAL ERIC HOLDER,                          )
in his official capacity,                              )
U.S. Department of Justice                             )
950 Pennsylvania Avenue, N.W.                          )
Washington, D.C. 20530;                                )
                                                       )    Civil Action No. **3:15-CV-241**
FORMER FEDERAL BUREAU OF                               )
INVESTIGATION DIRECTOR                                 )         **VARLAN/GUYTON**
ROBERT S. MUELLER, III,                                )
in his official capacity, address unknown;             )
                                                       )
FEDERAL BUREAU OF INVESTIGATION                        )
EMPLOYEE PATRICK W. KELLEY,                             )
in his individual and official capacities,             )
Federal Bureau of Investigation                        )
935 Pennsylvania Avenue, N.W.                          )
Washington, D.C. 20535;                                )
                                                       )
AN UNKNOWN NUMBER OF                                   )
UNKNOWN EMPLOYEES OF THE U.S.                           )
DEPARTMENT OF JUSTICE, in their                        )
individual and official capacities, addresses          )
unknown;                                               )
                                                       )
AN UNKNOWN NUMBER OF                                   )
UNKNOWN EMPLOYEES OF THE                                )
FEDERAL BUREAU OF                                      )
INVESTIGATION, in their individual and                 )
official capacities, addresses unknown;                )

U.S. DEPARTMENT OF JUSTICE )
950 Pennsylvania Avenue, N.W. )
Washington, D.C. 20530; and )
)
FEDERAL BUREAU OF INVESTIGATION )
J. Edgar Hoover Building )
935 Pennsylvania Avenue, N.W. )
Washington, D.C. 20535, )
)
Defendants. )
_____ )

## COMPLAINT

### Introduction

1. This complaint sets forth a cause of action under the Federal Tort Claims Act, 28
U.S.C. §§ 1346, 2671-2680, for legal and professional malpractice by attorneys and senior
executives employed by the U.S. Department of Justice (DOJ) and the Federal Bureau of
Investigation (FBI) who were responsible for administering and operating the agencies'
congressionally mandated ethics programs. Plaintiff also seeks actual damages as well as fees
and costs from the DOJ and the FBI for their intentional and willful violation of the Privacy Act,
5 U.S.C. § 552a, *et seq.* Plaintiff further seeks actual damages as well as fees and costs from
Defendant Kelley, Defendant Mueller, Defendant Holder and other unknown, unnamed
employees of the DOJ and FBI for deprivation of Plaintiff's Fifth Amendment liberty interests
pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

2. This complaint contains no information classified pursuant to Executive Order 13526.

3. The context for this cause of action is the grossly negligent practice of law by FBI
attorney and "designated agency ethics official" Patrick W. Kelley and other FBI and DOJ
employees. This complaint describes how the Defendants constructed, published and

2

disseminated an erroneous legal opinion to Plaintiff, to Plaintiff's employer, and to various others accusing Plaintiff of violating the post-employment, conflict of interest criminal statute found at Title 18, United States Code, Section 207(c); how this opinion was grounded in neither law nor fact; and how, as a direct and proximate cause of this erroneous legal opinion, the U.S. Department of Energy (DOE) and UT-Battelle, LLC, terminated Plaintiff's employment as the Senior Counterintelligence Officer for the DOE Oak Ridge Field Office of the DOE Office of Intelligence and Counterintelligence and revoked Plaintiff's Top Secret/Sensitive Compartmented Information/Q security clearances.

4. This complaint documents how Defendant Kelley's and other FBI/DOJ employees' publication, dissemination, and proclamation of this erroneous legal opinion decimated Plaintiff's professional reputation, disparaged Plaintiff's integrity, and falsely branded Plaintiff as a federal criminal, rendering Plaintiff unemployable and unable to provide for his family.

5. This complaint further details how Defendants' derelict failure to perform their mandated legal duties to Plaintiff was driven by Defendants' blinding animus toward Plaintiff for Plaintiff's prior whistleblower reports of FBI and DOJ mismanagement of the FBI's investigation into the anthrax attacks of 2001 (code named "AMERITHRAX").

## Jurisdiction

6. This case arises under the laws of the United States and presents federal questions within this Court's jurisdiction under Title 28, United States Code, Section 1331. This case is brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671-2680; the Privacy Act, 5 U.S.C § 552a, *et seq.*; and *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). This Court has exclusive subject matter jurisdiction over Plaintiff's FTCA claim. 28 U.S.C. § 1346(b). This Court also jurisdiction over Plaintiff's Privacy Act cause of

3

action. 5 U.S.C. § 552a(g)(1)(D) and § 552a(g)(4).

<u>**Venue**</u>

7. Venue is proper in the Eastern District of Tennessee for Plaintiff's FTCA, *Bivens* and Privacy Act causes of action. With regard to the FTCA, Title 28, United States Code, Section 1402(b) provides that "[a]ny civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the Plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Plaintiff resides in Friendsville, Tennessee which is within the territorial allocation of the Eastern District of Tennessee. The Privacy Act likewise authorizes an action to enforce liability to be brought "in the district court of the United States in the district in which the complainant resides." 5 U.S.C. § 552a(g)(5). Venue for Plaintiff's *Bivens* cause of action is appropriate in the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because the Eastern District of Tennessee is where a substantial part of the events giving rise to the claim occurred.

<u>**Parties**</u>

8. Plaintiff Richard Lambert is a citizen of the United States and a resident of the City of Friendsville in the State of Tennessee. Mr. Lambert has devoted the entirety of his adult life to public service. He began his career as an Assistant City Manager in 1980. After graduating from law school and gaining admission to the Texas Bar, his law practice was dedicated exclusively to the representation of cities, towns, and political subdivisions before Texas regulatory agencies. Mr. Lambert entered on duty with FBI as a Special Agent in July 1988 and retired as the Special Agent in Charge of the FBI Knoxville Division in March 2012. During his 24 year tenure with the FBI, Mr. Lambert served in the following positions: Violent

4

Crime/White Collar Crime Investigator (St. Louis Division); Supervisor - Civil Litigation Unit (FBIHQ); Supervisor - Employment Law Unit (FBIHQ); Supervisor – Office of Professional Responsibility (FBIHQ); Organized Crime/Drug Squad Supervisor (Norfolk Division); Assistant Inspector (FBIHQ); Assistant Special Agent in Charge (San Diego Division); Inspector in Charge – AMERITHRAX Major Case 184 (FBIHQ); and Special Agent in Charge (Knoxville Division). While he received numerous commendations and awards throughout his FBI career, Mr. Lambert was never the subject of any disciplinary action for any reason. Immediately upon retirement from the FBI in March 2012, Mr. Lambert was appointed by the U.S. DOE and UT-Battelle, LLC as the Senior Counterintelligence Officer for the Oak Ridge Field Office of the DOE Office of Intelligence and Counterintelligence. While serving in this DOE position, Mr. Lambert was also employed as an adjunct faculty member by the University of Tennessee where he served as a Leadership Development Advisor to students pursuing the Master of Business Administration degree. Mr. Lambert holds a Doctor of Jurisprudence degree, and three Master's degrees in Political Science, Public Administration, and Business Administration. As a result of Defendants' grossly negligent and erroneous legal opinion, Mr. Lambert was fired from his DOE-UT-Battelle position on June 10, 2013 and his contract with the University of Tennessee has not been renewed. Due to the notoriety and stigma surrounding Defendants' erroneous legal opinion and its plain implication that he is a federal felon, Mr. Lambert is currently unemployed and unemployable.

9. Defendant Attorney General Eric Holder heads the United States Department of Justice, which is the agency of the United States government responsible for enforcement of the federal criminal laws including the investigation and prosecution of violations of federal law by federal employees. 28 U.S.C. §§ 503, 535. He is the highest ranking law enforcement officer in

5

the United States. All functions of the agencies and employees of the Department of Justice are vested in the Attorney General. 28 U.S.C. § 509. As stated in the Attorney's General's Strategic Plan for 2014-2018, General Holder's mission includes "ensur[ing] fair and impartial justice for all Americans." http://www.justice.gov/sites /default/files/jmd/legacy/2014/02/28/ doj-fy-2014-2018- strategic-plan.pdf (last visited Mar. 20, 2015). General Holder had ultimate authority for supervising all of the operations and functions of the Department of Justice, including those of DOJ's subordinate bureau, the FBI, at all times relevant to this complaint. He was ultimately and specifically responsible for ensuring that he and Defendant FBI Director Robert Mueller: (1) "exercise[d] personal leadership in establishing, maintaining, and carrying out the agency's [FBI's and DOJ's] ethics program;" (2) made "available to the ethics program sufficient resources (including . . . legal . . . staff) to enable the agency [FBI and DOJ] to administer its program in a positive and effective manner;" and, (3) appointed an individual to serve as the designated agency ethics official who was sufficiently competent in "administrative, legal, managerial, or analytical work" to *"[c]ounsel former agency officials on post-employment conflict of interest standards."* 5 C.F.R § 2638.202(a)-(b)(4) (emphasis added). Attorney General Holder breached these duties by failing to adequately train, supervise, and advise Defendant Mueller and Defendant Kelley in carrying out these responsibilities as mandated by the Office of Government Ethics (OGE). As a consequence of this breach, the FBI failed to administer its ethics program in a positive and effective manner, resulting in the FBI's construction and publication of a grossly negligent and erroneous legal opinion which caused Plaintiff's employment to be terminated. Along with the United States, Defendant Attorney General Holder is sued in his official capacity for money damages and for declaratory and injunctive relief.

6

10. Defendant Robert S. Mueller, III, was the Director of the FBI at all times relevant to this cause of action. By order of the Office of Government Ethics, Defendant Mueller was required to "exercise personal leadership in establishing, maintaining, and carrying out the agency's ethics program;" and to make "available to the [FBI] ethics program sufficient resources (including . . . legal . . . staff) to enable the agency to administer its program in a positive and effective manner." 5 C.F.R. § 2638.202(a). Defendant Mueller was also required to "appoint an individual to serve as the [FBI's] designated agency ethics official and an individual to serve in an acting capacity in the absence of the primary designated agency ethics official." 5 C.F.R. § 2638.202(b). In selecting these individuals, Defendant Mueller was required by the Office of Government Ethics to "ensure that the experience of such appointees in administrative, legal, managerial, or analytical work demonstrates the ability to . . . *[c]ounsel* former agency officials on post-employment conflict of interest standards." 5 C.F.R. § 2638.202(b)(4) (emphasis added). In selecting Defendant Patrick Kelley as the FBI's designated agency ethics official and/or deputy designated agency ethics official, Defendant Mueller failed to ensure that Defendant FBI attorney Kelley possessed the requisite legal experience and special competency required to provide counsel to former agency officials regarding the applicability of post-employment ethics rules found in congressional statutes and the regulations of the Office of Government Ethics. Director Mueller likewise failed to adequately train and supervise Defendant FBI attorney Kelley in the performance of Defendant Kelley's duty to provide counsel to former agency officials regarding post-employment conflict of interest standards. As a direct and proximate consequence of this failure, Defendant attorney Kelley issued a grossly negligent and erroneous legal opinion which caused Plaintiff's employment to be terminated. Along with the United States, Defendant Robert Mueller is sued in his official capacity for

7

money damages and for injunctive relief.

11. Defendant FBI attorney Patrick W. Kelley held a number of titles at various times relevant to this complaint including Designated Agency Ethics Official, Deputy Designated Agency Ethics Official, Assistant Director, Chief Compliance Officer, and/or Director of the FBI Office of Integrity and Compliance. The specific chronology of his tenure in these positions is not known but will be determined through an opportunity for reasonable discovery. As described in detail *infra*, in November 2012, FBI attorney Kelley issued a grossly negligent and erroneous legal opinion which falsely alleged that Plaintiff was violating the criminal conflict of interest provisions found in Title 18, United States Code, Section 207(c). FBI attorney Kelley then published his legal opinion, causing it to be disseminated to FBI Headquarters personnel, FBI Knoxville Division personnel, Plaintiff's employer - the U.S. DOE and UT-Battelle, LLC, and various unknown others in East Tennessee and Washington D.C. Plaintiff is informed and believes that Knoxville Division Special Agent in Charge Kenneth Moore openly predicted within and without the FBI that Plaintiff's indictment was imminent, spawning speculation within the local community that Plaintiff would soon be arrested and jailed. As a direct and proximate cause of Defendant Kelley's erroneous legal opinion and false allegations, DOE and UT-Battelle, LLC terminated Plaintiff's employment as a Senior Counterintelligence Officer and revoked Plaintiff's security clearances. Along with the United States, Defendant FBI attorney Kelley is sued in his individual capacity for monetary damages, and in his individual and official capacities for declaratory and injunctive relief.

12. The true names and capacities of the individual Defendants sued as Unknown Employees of the DOJ and Unknown Employees of the FBI are unknown to Plaintiff. Plaintiff is informed and believes and thereon alleges that such Defendants are legally responsible for each

8

of the acts and omissions causing the claimed damages. The identities of the Unknown Employees of the DOJ and Unknown Employees of the FBI Defendants will be determined after a reasonable opportunity for discovery. Along with the United States, said Defendants are sued in their individual and official capacities.

13. Defendant FBI is a federal agency within the meaning of 5 U.S.C § 552a(a)(1).

14. Defendant DOJ, the parent agency of Defendant FBI, is also a federal agency within the meaning of 5 U.S.C § 552a(a)(1).

## Exhaustion of Administrative Remedies

15. As required by Title 28, United States Code, Section 2675(a), Plaintiff presented this FTCA claim to both the DOJ and FBI by separate certified mailings dated October 23, 2014. On December 18, 2014, Plaintiff received a hand-scrawled envelope from the FBI containing a letter addressed to "Richard C. Lambert" [sic] which denied Plaintiff's FTCA claim. Plaintiff's Original Complaint Exhibit A. Accordingly, Plaintiff has exhausted the administrative remedies which are a condition precedent to this cause of action.

## Controlling Law

16. When an act of negligence occurs in one state and results in an injury or death in another state, the applicable law in an action under the Federal Tort Claims Act is that of the state where the negligence occurs. *Richards v. U.S.*, 369 U.S. 1 (1962); Simon v. U.S., 341 F.3d 193 (3d Cir. 2003), *certified question accepted,* 794 N.E.2d 1087 (Ind. 2003), *certified question answered*, 805 N.E. 2d 798 (Ind. 2004) (law of state where last significant act or omission occurred); *Sewell v. U.S.*, 629 F. Supp. 448 (W.D. La. 1986). In this case, Defendants' legal and professional malpractice occurred in the District of the District of Columbia which is the situs of FBI Headquarters, DOJ Headquarters, the DOJ Public Integrity Section, the Office of the FBI

9

Director, the Office of the Attorney General, and the Office of Defendant FBI attorney Kelley.

Accordingly, the applicable substantive law in this FTCA action is that of the District of

Columbia. Moreover, Congress has mandated that "[a]n attorney for the Government shall be

subject to State laws and rules . . . governing attorneys in each State where such attorney engages

in that attorney's duties, to the same extent and in the same manner as other attorneys in that

State." 28 U.S.C. § 530B(a).

## Facts

17. The following facts are alleged based on information and belief.

### Factual Background

18. On March 9, 2012, Plaintiff retired from the FBI as the Special Agent in Charge

(SAC) of the Knoxville Division after 24 years of service. The SAC position is a Senior

Executive Service (SES) position within the federal government. On March 12, 2012, Plaintiff

began serving as the Senior Counterintelligence Officer (SCIO) for the DOE Oak Ridge

Counterintelligence Field Office (ORFO). The ORFO is physically lodged at Oak Ridge

National Laboratory in Oak Ridge, Tennessee. Plaintiff was appointed to the SCIO position by

the U.S. Department of Energy (DOE) Office of Intelligence and Counterintelligence and UT-

Battelle, LLC. The job posting for the SCIO position, dated October 24, 2011, defined a "major

duty/responsibility" of this position as "[e]stablish and maintain liaison relationships with the

Federal Bureau of Investigation and other appropriate intelligence community and law

enforcement agencies."

19. One hundred percent of Plaintiff's SCIO salary was paid by the U.S. DOE.

20. As the SCIO, Plaintiff was in frequent communication with the FBI

Counterintelligence Agents embedded in the ORFO as well as with their supervisor, Supervisory

10

Special Agent Frank Graziano of the FBI Knoxville Division's Oak Ridge Resident Agency. The purpose of these communications was to share intelligence, report new counterintelligence/counterterrorism allegations, discuss case developments, coordinate joint investigations, and deconflict investigative activities as required by the statutes, regulations, agency agreements, Attorney General Guidelines and the DOE policy statements detailed *infra.*

21. UT-Battelle, LLC is a limited liability corporation representing a partnership between the University of Tennessee (UT) and Battelle Memorial Institute (Battelle). The University of Tennessee is an accredited, degree granting institution of higher education. Battelle is medical research organization, exempted and defined under section 501(c)(3) of the Internal Revenue Code, which is headquartered in Columbus, Ohio. UT-Battelle, LLC was created for the sole purpose of managing and operating Oak Ridge National Laboratory (ORNL) for the DOE. ORNL is located in Oak Ridge, Tennessee. The Director of ORNL is a UT-Battelle employee. Plaintiff's DOE-funded salary was disbursed by UT-Battelle pursuant to a contract between DOE and UT-Battelle. In pertinent part, that contract provides:

> (b) (Modification) The contractor [UT-Battelle] shall appoint a qualified employee(s) to function as the Contractor Counterintelligence Officer to support all facilities for which the [DOE] Oak Ridge [Field] Office has cognizance for the Counterintelligence function. The Contractor Counterintelligence Officer will be responsible for conducting defensive Counterintelligence briefings and debriefings of employees traveling to foreign countries or interacting with foreign nationals; providing thoroughly documented written reports relative to targeting suspicious activity and other matters of Counterintelligence interest; immediately reporting targeting, suspicious activity and other Counterintelligence concerns to the DOE Headquarters Counterintelligence Division; and providing assistance to other elements of the U.S. Intelligence Community as stated in the aforementioned Executive Order [12333], and other pertinent national and Departmental Counterintelligence requirements. [DOE Contract No. DE-AC05-00OR22725,

11

Modification No. 341 § I.123970.5204-1]

22.  The ORFO was responsible for protecting eight DOE facilities from terrorist attack and the activities of foreign intelligence services:  Oak Ridge National Laboratory (ORNL); Y-12 National Security Complex; Oak Ridge Institute for Science and Education; Oak Ridge Operations Office; Office of Science and Technical Information; East Tennessee Technology Park; Paducah, Kentucky Gaseous Diffusion Plant; and the Portsmouth, Ohio Gaseous Diffusion Plant.  Personnel assigned to the ORFO included a Senior Counterintelligence Officer, a Deputy Senior Counterintelligence Officer, nine Counterintelligence Officers, two Intelligence Analysts, and an Intelligence Support Specialist.  The salaries of all of these ORFO personnel were funded and paid in their totality by the DOE Office of Intelligence and Counterintelligence, not UT-Battelle.  In addition to DOE-funded personnel in the ORFO, a number of FBI Counterintelligence Agents from the FBI Oak Ridge Resident Agency were embedded in the ORFO pursuant to Presidential Decision Directive 61 (PDD 61).

*Legal and Regulatory Background*

23.  A staggering wealth of law encompassing legislative statutes, agency regulations, executive orders, a presidential decision directive, four DOE-FBI memoranda of understanding, and various DOE directives demonstrate that while employed as the DOE SCIO, Plaintiff was at all times carrying out official duties on behalf of the United States, *videlicet*:

24.  The DOE Office of Intelligence and Counterintelligence is a member of the U.S. Intelligence Community.  Exec. Order No. 12333 §§ 1.7(i), 1.12 (1981), *reprinted as amended in* 50 U.S.C. § 401 note (2006).  Further, "counterintelligence" is a "United States Intelligence Activity" as defined in Executive Order 12333.  Exec. Order No. 12333 § 1.4(b) (1981).

25.  "The direction and control of counterintelligence operations" is an "inherently

12

governmental function." Federal Acquisition Regulations § 7.503(a)(8). Indeed, at all times relevant to this complaint, the DOE Counterintelligence Directorate issued badges and photographic credentials to all ORFO Counterintelligence Officers which proclaimed: "By *authority of the Secretary of Energy*, as specified in DOE Order 475.1, the Atomic Energy Act of 1954, as amended; and the Department of Energy Organization Act, the individual pictured above has been designated to conduct investigations and administrative inquiries *on behalf of the Counterintelligence Directorate*." Emphasis added. These credentials were signed by the Deputy Director, DOE Counterintelligence Directorate, not by any employee of UT-Battelle.

26. Presidential Decision Directive 61 is titled "U.S. Department of Energy Counterintelligence Program." It was promulgated in 1998 in response to the concerns of U.S. officials that China had stolen sensitive information from American nuclear weapons laboratories in the mid-1980s. Due to these concerns, the administration worked to tighten security at DOE labs to prevent future breaches. DOE prepared a broad assessment of two decades of Chinese thefts of nuclear weapons information from its facilities and briefed senior administration officials on its conclusions in 1997. DOE's briefings focused attention on the need to address long-term security derelictions at the US nuclear labs. Within weeks, the administration created a special working group of the National Counterintelligence Policy Board to make recommendations for strengthening lab security. The board's recommendations became the basis for PDD-61, issued in February 1998. In the directive, President Clinton ordered the DOE to establish a stronger counterintelligence program by, among other things, increasing FBI involvement in national laboratory counterintelligence operations. PDD-61 makes plain that DOE Counterintelligence personnel assigned to the DOE national laboratories report to the Director of the DOE Office of Counterintelligence (OCI), not to the laboratory directors of the

13

national labs where their offices are located: "CI personnel assigned to the laboratories will have direct *access* to the laboratory director and will concurrently *report to the Director [DOE] OCI.*" PDD-61 at 2 (emphasis added). This edict is further reiterated in the DOE job posting for the SCIO position to which Plaintiff was appointed: "[T]he SCIO will have direct *access* to the laboratory director and will concurrently *report to the Director, Office of Intelligence and Counterintelligence, DOE* (emphasis added)."

27. Following the promulgation of PDD-61, the FBI and the DOE further refined and delineated their specific roles, responsibilities and collaborative obligations at the national laboratories as memorialized in four key documents: "Memorandum of Understanding Among the Federal Bureau of Investigation, the Department of Energy-Office of Counterintelligence and National Nuclear Security Administration Office of Defense Nuclear Counterintelligence," dated April 30, 2002 (*hereinafter* "2002 FBI-DOE MOU") ; the "Revision to the Memorandum of Understanding Among the U.S. Department of Energy, the National Nuclear Security Administration and the Federal Bureau of Investigation," dated August 25, 2003 (*hereinafter* 2003 FBI-DOE MOU); the "Addendum – Memorandum of Understanding Among the Federal Bureau of Investigation[,] the Department of Energy-Office of Counterintelligence, and the National Nuclear Security Administration-Office of Defense Nuclear Counterintelligence," signed February 19 and 23, 2004 (hereinafter "2004 FBI-DOE MOU Addendum"); and, the National Joint Terrorism Task Force Memorandum of Understanding, dated May 30, 2007.

28. The seminal 2002 FBI-DOE MOU was transmitted to all DOE SCIOs by cover letter ("Memorandum for Distribution"), dated April 30, 2002, from the Director of the DOE Office of Counterintelligence. It admonished the SCIOs as follows: "We believe a strong and consistent liaison relationship with the FBI is a very significant measure of success as to your

14

Counterintelligence Program." This articulated expectation echoes the MOU's statement of purpose - to address "concerns" regarding "the timely exchange of counterintelligence information among the FBI, DOE, and NNSA." To that end, the 2002 FBI-DOE MOU mandated, *inter alia*, that "[t]he DOE and NNSA will assist in FBI foreign counterintelligence and counter-terrorism investigations and activities to the extent of the DOE's and NNSA's authority . . . ." 2002 FBI-DOE MOU § IV. It reciprocally required that "[t]he FBI shall keep the DOE or NNSA informed of the status of all foreign counterintelligence investigations referred by, or involving the personnel, operations or information of the DOE or NNSA." 2002 FBI-DOE MOU § VII. The MOU likewise decreed the sharing of information between the agencies: "The parties to this agreement shall share analytical and research reports pertaining to foreign intelligence activities directed at the DOE." 2002 FBI-DOE MOU § VII.

29. The 2003 FBI-DOE MOU enhanced FBI oversight of DOE counterintelligence functions by embedding FBI counterintelligence Agents in the DOE national laboratories. It provided that "[t]he Agents in the Labs initiative is intended to strengthen the FBI's National Counterintelligence Strategy and promote an enhanced working relationship with the DOE by providing increased counterintelligence, investigative and liaison support to the Department and the affected weapons, research, and science sites." 2003 FBI-DOE MOU § VIII. According to the MOU, "[c]o-location [sic] is expected to facilitate productive working relationships between the parties. Co-location [sic] will ensure dedicated FBI support of DOE/NNSA CI matters and facilitate DOE/NNSA support of FBI operational and investigative activities." 2003 FBI-DOE MOU § VIII. It further mandated:

> (U) Special Agent Assignees at the sites will exchange information and work in collaboration with DOE CI Program personnel on counterintelligence and counterterrorism (CT) investigations, and other site-related matters, particularly those that

15

exceed the jurisdictional limits of the DOE CI Program.

. . . .

(U) The activities of the [FBI] Special Agent Assignees
will be coordinated with the site Senior Counterintelligence
Officer.

(U) The work of the [FBI] Special Agent Assignees which
concerns their laboratories and sites will be made known to and
coordinated with the site SCIO.

30. Like the 2002 MOU, the 2003 MOU provides for reciprocal collaboration: "The

DOE CI Program will assist and support the [FBI] Special Agent Assignees in carrying out their

investigative and liaison duties at the sites" and "[u]pon request, the DOE will provide to the FBI

relevant counterintelligence information from its files and databases." 2003 FBI-DOE MOU §

VIII. The MOU specifically identifies Oak Ridge National Laboratory as a DOE site required to

participate in the FBI's Agent in the Lab Program. 2003 FBI-DOE MOU § VIII.

31. The 2004 FBI-DOE MOU Addendum expanded the subject matter context of the

2003 MOU to encompass not only counterintelligence information sharing but also

"counterterrorism information whereby the FBI will keep the DOE or NNSA informed of the

status of all counterterrorism investigations referred by or involving the personnel, operations, or

information of the DOE or NNSA." 2004 FBI-DOE MOU Addendum.

32. The 2007 NJTTF MOU prescribed a similar framework for collaboration between

the DOE and FBI within the National Joint Terrorism Task Force.

33. To further emphasize that the SCIO position was under the exclusive direction and

control of the DOE Office of Counterintelligence, in 2012 the Director of that office issued the

following imperative to all DOE Office of Counterintelligence employees:

> SCIOs are the field commanders of DOE's national
> counterintelligence program. . . .
> . . .
> SCIOs must understand clearly that their authority to conduct

16

> counterintelligence investigations and inquiries *is based on the federal authorities of DOE/IN and that their command accountability on investigative matters is to IN-1.* In no instance does the SCIO seek the [contract] laboratory director's, [contract] plant manager's, or federal site manager's approval for opening, continuing, discontinuing, or establishing strategic objectives of the investigation or inquiry. Moreover, SCIOs must report directly to IN-1 on any instance where local [contract] executive management attempts to discourage or hamper the independent conduct of counterintelligence investigations or inquiries.

Memorandum for Department of Energy (DOE) Office of Intelligence and Counterintelligence (IN) from E. Bruce Held, Director and Charles K. Durant, Deputy Director, Subject: "Counterintelligence Roles and Responsibilities," dated May 11, 2012 (emphasis added).

34. Further underscoring that DOE SCIOs function "on behalf of the United States" is section 811 of the Intelligence Authorization Act of 1995 which requires DOE to report to the FBI any known or suspected compromise of classified information. Intelligence Authorization Act for Fiscal Year 1995, Pub. Law No. 103-359, 108 Stat. 3423 (1995). For this reason, the job posting for the SCIO position enumerates one of the SCIO's responsibilities as: "Manage CI/CT investigations, ensuring appropriate referrals are made to the Federal Bureau of Investigation as required by Section 811 of the Intelligence Authorization Act of 1995."

35. The authority of an SCIO to communicate with U.S. Intelligence Community agencies (including the FBI) "on behalf of the United States" was long ago approved by the Attorney General as promulgated in the Department of Energy Procedures for Intelligence Activities Approved by the Attorney General Under Executive Order 12333 (Oct. 19, 1992) at 25:

> DOE and *DOE contractor employees* shall conduct intelligence activities only in accordance with Executive Order 12333, applicable laws, other Executive orders, Presidential directives, DOE policy, these procedures when acting *on behalf of a DOE*

17

> *Intelligence Component,* and the applicable Procedures of another
> IC member when acting on behalf of that IC member agency in
> response to tasking. (emphasis added)

Further, these Attorney General-approved procedures for DOE intelligence activities define

"Participation on Behalf of a DOE Intelligence Component" as follows: "Participation on behalf

of a DOE Intelligence Component may also occur when a DOE employee or *contractor*

*employee* acts upon his own initiative but *for the benefit of that component*." Department of

Energy Procedures for Intelligence Activities Approved by the Attorney General Under

Executive Order 12333 (Oct. 19, 1992) at 10 (emphasis added).

<em>Operative Facts Giving Rise to this Cause of Action</em>

36. On November 8, 2012, FBI attorney and designated agency ethics official Patrick

Kelley issued a legal opinion which averred that Plaintiff was violating the one-year "cooling

off" criminal provisions of Title 18, United States Code, Section 207(c). Specifically, by e-mail

dated November 8, 2012 at 4:55 p.m. (Plaintiff's Original Complaint Exhibit B), Kelley advised

the FBI Counterintelligence Division as follows:

> Section 207(c) of Title 18, U.S. Code, prohibits former Federal
> [sic] SES/SL employees from communicating with employees of
> their former component with the intent to influence official action
> for one year after they separate from government service. . . .
>
> After I put out an email reminder to this effect a few weeks ago,
> SAC Ken Moore in Knoxville asked me at the SAC conference
> whether that meant that he couldn't talk to former SAC Rick
> Lambert who is now the "Senior DOE Counterintelligence
> Officer" at the Oak Ridge National Lab in Knoxville after retiring
> from the FBI. I told Ken that it might *but I would have to dig into
> it.* I found that, notwithstanding his title, Rick is not a DOE
> employee but, rather, works for a contractor who runs the Lab for
> the government. Even though Rick's salary can be traced to
> Government funds and his work is on behalf of DOE, *I thought* the
> restrictions of 207 (c) applied because of that fact. Because I
> wasn't certain, I wanted to *check with both DOE and DOJ ethics*

18

*offices.* DOE advised that it was an FBI/DOJ responsibility to advise Rick but said that, if he was a former DOE employee, then he would be bound by 207(c) restrictions –*which I took to mean that they thought* the statute applied to Rick's situation. *DOJ concurs.* So, I will send an email to both Ken [Moore] and Rick today delivering the determination. That will mean that Rick cannot talk directly to any FBI employee; which will be problematic since we have two agents imbedded [sic] in the Lab. I've discussed this with Mike Fedarcyk (former FBI) who runs the program in which Rick works so they can deal with it on their end. Ken will have to figure it out on our end. I know this will prove disruptive but I see no way around it and the statute is a criminal prohibition so we can't very well ignore it. (emphasis added)

37. Kelley then caused his erroneous legal opinion to be disseminated, published, and conveyed to Plaintiff, to executive managers in the FBI Counterintelligence Division, and to the Knoxville Special Agent in Charge Kenneth Moore who further disseminated, published, and conveyed it to Plaintiff's employer UT-Battelle. Defendant Kelley further referred his opinion to the U.S. Department of Justice Office of the Inspector General; other unknown, unnamed officials in the U.S. Department of Justice; other unknown, unnamed officials of the U.S. Department of Energy; and other unknown, unnamed officials of UT-Battelle, LLC. Kelley directed that some of these recipients of his legal opinion further disseminate, publish and convey it to other unknown, unnamed individuals.

38. Immediately upon receiving Defendant Kelley's legal opinion, Plaintiff informed Defendant Kelley that his legal opinion was wrong and provided him with the controlling law and operative facts which are comprehensively detailed in this complaint. Moreover, Plaintiff requested that Kelley provide Plaintiff with the legal and factual basis for his conclusion that Plaintiff was violating Title 18, Section 207(c). Kelley failed, refused, and otherwise declined to provide Plaintiff with any citation to law or fact to support his legal conclusion other than Kelley's alleged canvass of his Washington colleagues. Defendant Kelley's "phone a friend"

19

approach to the practice of law was bereft of fact finding and devoid of legal analysis, constituting little more than off-the-cuff conjecture and a "best guess." In response to Defendant Kelley's continuing and ongoing propagation of his erroneous legal opinion, Plaintiff self-reported Kelley's conflict of interest allegations to both the United States Attorney for the Eastern District of Tennessee and to the FBI Office of Professional Responsibility at FBI Headquarters. Both entities deemed Defendant Kelley's legal opinion to be meritless.

39. As a direct and proximate cause of Defendant Kelley's legal opinion that Plaintiff was violating the criminal provisions of Title 18, United States Code, Section 207(c) and Defendants' widespread publication of that opinion, DOE - UT-Battelle LLC terminated Plaintiff's employment and revoked Plaintiff's security clearances on June 10, 2013.

40. As a further direct and proximate result of Defendant Kelley's legal opinion that Plaintiff was engaged in criminal conduct, the U.S. Department of Justice Office of the Inspector General (OIG) and the U.S. Department of Justice Public Integrity Section (PIS) launched and sensationalized massive criminal probes, which included the dispatch of teams of OIG Special Agents and PIS attorneys to East Tennessee who raided and searched Plaintiff's office at Oak Ridge National Laboratory, seized and analyzed Plaintiff's personal documents and effects, and interrogated dozens of Plaintiff's ORFO coworkers and associates in a wild fishing expedition festooned with prurient inquisitions into the intimate and irrelevant details of Plaintiff's private life and marital status. After expending a full year in the throes of sleuthing at a cost of hundreds of thousands of dollars to U.S. taxpayers, the Department of Justice concluded its imbroglio with a whimper, appearing at the altar of the Grand Jury without even so much as the proverbial ham sandwich - flat footed, empty-handed and as dead in the water as the Ancient Mariner. No violation of Title 18, United States Code, Section 207(c) was identified – a

20

determination which could have been reached by the simple application of law to fact at the outset. Instead, the Defendants undertook their criminal probe without a scintilla of predication in retaliation for Plaintiff's prior whistleblowing reports.

41. Due to the stigmatizing publicity and notoriety surrounding Defendant Kelley's legal opinion and Defendants' inquisition, Plaintiff has been blackballed with the specter of illegal conduct and ethics violations, unable to gain reemployment despite his submission of more than 70 job applications to various employers.

## The Law

42. Title 18, United States Code, Section 207(c) imposes a one year "cooling off" restriction on certain senior personnel of the executive branch who leave government service:

> [A]ny person who is an officer or employee . . . of the executive branch of the United States . . . and who, within 1 year after the termination of his or her service or employment as such officer or employee, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of the department or agency in which such person served within 1 year before such termination, on behalf of any other person (*except the United States*), in connection with any matter on which such person seeks official action by any officer or employee of such department or agency, shall be punished as provided in section 216 of this title.

28 U.S.C. § 207(c) (emphasis added). As emphasized in the quoted text, the communication restriction does not apply when the former employee is communicating with his or her former agency "on behalf of" "the "United States." This exception is reiterated in section 207(j)(1)(A) which states: "The restrictions contained in this section shall not apply to acts done in carrying out official duties *on behalf of the United States.*" 18 U.S.C. § 207(j)(1)(A) (emphasis added).

43. As memorialized in Executive Order 12674, the President has imbued the Office of Government Ethics (OGE) with executive authority to interpret and provide guidance to federal

21

agencies concerning the conflict of interest statutes. Pursuant to that authority, the OGE has

promulgated and published regulations expounding upon the post-employment conflict of

interest restrictions in section 207. OGE's edifications state: "A former employee is not

prohibited by any of the prohibitions of 18 U.S.C. 207 from engaging in any activity *on behalf of

the United States*." 5 C.F.R. § 2641.301(a) (emphasis added). According to the OGE, "a former

employee engages in activities on behalf of the United States when he serves: (1) As a

*representative of the United States* pursuant to *a specific agreement* with the United States to

provide representational services to the United States . . . ." 5 C.F.R § 2641.301(a)(2)(ii). The

contract between DOE and UT-Battelle (*i.e.*, DOE Contract No. DE-AC05-00OR22725,

Modification No. 341 § I.123970.5204-1), set forth *supra*, specifically and expressly requires

UT-Battelle's representational appointment of an SCIO to carry out the inherent governmental

functions of the DOE Office of Counterintelligence in the Oak Ridge Field Office. Moreover, as

described in the above-quoted provisions of the DOE Procedures for Intelligence Activities

Approved by the Attorney General Under Executive Order 12333 (Oct. 19, 1992), the Attorney

General of the United States has expressly envisaged and sanctioned such representational

agreement.

44. The Privacy Act prohibits the FBI and DOJ from disclosing "any record which is

contained in a system of records by any means of communication to any person, or to another

agency, except pursuant to a request by, or with the prior written consent of, the individual to

whom the record pertains . . . ." 5 U.S.C. § 552a(b). Here, the FBI and DOJ intentionally and

willfully disclosed to Plaintiff's employer and others, records kept by the agencies pertaining to

Plaintiff in order to convey the false impression that Plaintiff was guilty of violating the federal

conflict of interest statute, 18 U.S.C. § 207(c).

45. DOJ regulations found at 28 C.F.R. § 50.2 further require DOJ personnel to "refrain from making available" "[o]bservations about a Defendant's character[,]" "statements concerning evidence or argument in the case" and "[a]ny opinion as to the accused's guilt . . . ." These regulations govern the public statements of FBI personnel with respect to criminal defendants and accused individuals. The privacy and liberty interests served by these regulations are heightened and sacrosanct when the citizen FBI personnel publicly expose to condemnation is not charged with any crime.

46. The DOJ United States Attorney's Manual specifically prohibits public commentary regarding uncharged parties. It states: "In all public filings and proceedings, federal prosecutors should remain sensitive to the privacy and reputation interests of the uncharged third parties. . . . [T]his means that, in the absence of some significant justification, it is not appropriate to identify (either by name or unnecessarily-specific description) . . . a third-party wrongdoer unless that party has been officially charged with the misconduct at issue. . . ." U.S. Attorney's Manual § 9.27.760 (2003-2015). The letter and spirit of these DOJ regulations pertain directly to FBI employees as agents of the Attorney General and DOJ.

47. The U.S. Attorney's Manual goes on to state that "[a]s a series of cases make clear, there is ordinarily 'no legitimate governmental interest served' by the government's public allegation of wrongdoing by an uncharged party . . . . *In re Smith*, 656 F.2d 1101, 1106-07 (5th Cir. 1981)." U.S. Attorney's Manual § 9-27.760 (2003-2015).

48. Notwithstanding these laws, regulations, and agency directives, Defendant FBI employees provided detailed information to Plaintiff's employer about Defendant Kelley's accusations, resulting in the termination of Plaintiff's employment and revocation of Plaintiff's security clearances.

23

**Defendants' Motivation for Legal Malpractice and Violation of the Privacy Act**

49. For more than a decade, retired FBI senior executives have served as Senior Counterintelligence Officers at DOE laboratories across the nation. Indeed, retired members of the FBI Senior Executive Service (SES) who are currently serving as DOE SCIOs include the former FBI Counterintelligence Assistant Director Dan Cloyd, former FBI Chicago Division SAC Larry Collins and former FBI SAC Fred Brink. At no point in time, other than the instant case, have Defendants ever accused a retired FBI SES employee of violating the section 207(c) conflict of interest provisions by serving as a DOE SCIO. Plaintiff, however, stands today the target of a discrete, insular and longstanding vendetta by Defendants.

50. In the fall of 2001, following the 9/11 attacks, a series of anthrax mailings occurred which killed five Americans and sickened 17 others. Four anthrax-laden envelopes were recovered which were addressed to two news media outlets in New York City (the *New York Post* and Tom Brokaw at NBC) and two senators in Washington D.C. (Patrick Leahy and Tom Daschle). The anthrax letters addressed to New York were mailed on September 18, 2001, just seven days after the 9/11 attacks. The letters addressed to the senators were mailed 21 days later on October 9, 2001. A fifth mailing of anthrax is believed to have been directed to American Media, Inc. (AMI) in Boca Raton, Florida based upon the death of one AMI employee from anthrax poisoning and heavy spore contamination in the building.

51. Executive management at FBI Headquarters assigned responsibility for the anthrax investigation (code named "AMERITHRAX") to the Washington Field Office (WFO), dubbing it the single most important case in the FBI at that time.

52. In October 2002, in the wake of surging media criticism, White House impatience

24

with a seeming lack of investigative progress by WFO, and a concerned Congress that was considering revoking the FBI's charter to investigate terrorism cases, Defendant FBI Director Mueller reassigned Plaintiff from the FBI's San Diego Field Office to the Inspection Division at FBI Headquarters and placed Plaintiff in charge of the AMERITHRAX case as an "Inspector." While leading the investigation for the next four years, Plaintiff's efforts to advance the case met with intransigence from WFO's executive management, apathy and error from the FBI Laboratory, politically motivated communication embargos from FBI Headquarters, and yet another preceding and equally erroneous legal opinion from Defendant Kelley – all of which greatly obstructed and impeded the investigation.

53. On July 6, 2006, Plaintiff provided a whistleblower report of mismanagement to the FBI's Deputy Director pursuant to Title 5, United States Code, Section 2303. Reports of mismanagement conveyed in writing and orally included: (a) WFO's persistent understaffing of the AMERITHRAX investigation; (b) the threat of WFO's Agent in charge to retaliate if Plaintiff disclosed the understaffing to FBI Headquarters; (c) WFO's insistence on staffing the AMERITHRAX investigation principally with new Agents recently graduated from the FBI Academy resulting in an average investigative tenure of 18 months with 12 of 20 Agents assigned to the case having no prior investigative experience at all; (d) WFO's eviction of the AMERITHRAX Task Force from the WFO building in downtown Washington and its relegation to Tysons Corner, Virginia to free up space for Attorney General Ashcroft's new pornography squads; (e) FBI Director's Mueller's mandate to Plaintiff to "compartmentalize" the AMERITHRAX investigation by stove piping the flow of case information and walling off task force members from those aspects of the case not specifically assigned to them – a move intended to stem the tide of anonymous media leaks by government officials regarding details of

25

the investigation. This sequestration edict decimated morale and proved unnecessary in light of subsequent civil litigation which established that the media leaks were attributable to the United States Attorney for the District of the District of Columbia and to a Supervisory Special Agent in the FBI's National Press Office, not to investigators on the AMERITHRAX Task Force; (f) WFO's diversion and transfer of two Ph.D. Microbiologist Special Agents from their key roles in the investigation to fill billets for an 18 month Arabic language training program in Israel; (g) the FBI Laboratory's deliberate concealment from the Task Force of its discovery of human DNA on the anthrax-laden envelope addressed to Senator Leahy and the Lab's initial refusal to perform comparison testing; (h) the FBI Laboratory's refusal to provide timely and adequate scientific analyses and forensic examinations in support of the investigation; (i) Defendant Kelley's erroneous and subsequently quashed legal opinion that regulations of the Occupational Safety and Health Administration (OSHA) precluded the Task Force's collection of evidence in overseas venues; (j) the FBI's fingering of Bruce Ivins as the anthrax mailer; and, (k) the FBI's subsequent efforts to railroad the prosecution of Ivins in the face of daunting exculpatory evidence. Following the announcement of its circumstantial case against Ivins, Defendants DOJ and FBI crafted an elaborate perception management campaign to bolster their assertion of Ivins' guilt. These efforts included press conferences and highly selective evidentiary presentations which were replete with material omissions. Plaintiff further objected to the FBI's ordering of Plaintiff not to speak with the staff of the CBS television news magazine *60 Minutes* or investigative journalist David Willman, after both requested authorization to interview Plaintiff.

54. In April 2008, some of Plaintiff's foregoing whistleblower reports were profiled on the CBS television show *60 Minutes*. This *60 Minutes* segment was critical of FBI executive management's handling of the AMERITHRAX investigation, resulting in the agency's

embarrassment and the introduction of legislative bills calling for the establishment of congressional inquiries and special commissions to examine these issues – a level of scrutiny the FBI's Ivins attribution could not withstand.

55. After leaving the AMERITHRAX investigation in 2006, Plaintiff continued to publicly opine that the quantum of circumstantial evidence against Bruce Ivins was not adequate to satisfy the proof-beyond-a-reasonable doubt threshold required to secure a criminal conviction in federal court. Plaintiff continued to advocate that while Bruce Ivins may have been the anthrax mailer, there is a wealth of exculpatory evidence to the contrary which the FBI continues to conceal from Congress and the American people. The FBI vehemently opposes Plaintiff's position.

56. While the anti-retaliation provisions of Title 5, United States Code, Section 2303 protect current FBI employees from reprisal for their whistleblowing activities, such protection ends when FBI employment ceases. Like Herodias, Defendants waited patiently for Plaintiff's retirement and then wielded a grossly negligent and erroneous interpretation of the conflict of interest statute as a blunt instrument of retaliation. Seemingly drunk with blood lust and blinded by animus, Defendants failed to discern that the platter on which they sought to serve Plaintiff's head was illusory - a factually unfounded and wholly meritless legal opinion.

### Causes of Action

*Count I*

*Violation of the Federal Tort Claims Act – Legal Malpractice of Defendant Kelley*

57. Paragraphs 1 through 56 are realleged and incorporated by reference herein.

58. The United States is liable for the torts of its employees "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "The

27

purpose of the Federal Tort Claims Act . . . is to lift federal sovereign immunity in order that victims of torts committed by federal employees in the scope of their employment can sue the federal government under the doctrine of respondeat superior, just as if the government were a private employer enjoying no immunities." *Sullivan v. Freeman*, 944 F.2d 334, 336 (7th Cir. 1991). "The theory . . . underlying the doctrine of respondeat superior is that it gives the employer an incentive, perhaps greater than that created by liability simply for negligence, to use his control over the employee to prevent tortious misconduct." *Sullivan v. Freeman*, 944 F.2d 334, 336 (7th Cir. 1991) (citing *Konradi v. United States,* 919 F.2d 1207, 1210–11 (7th Cir.1990)).

59. It is well established that the legal malpractice of federal government employees is redressable and justiciable under the Federal Tort Claims Act. *Devlin v. U.S.*, 352 F.3d 525, 536 (2nd Cir. 2003) ("There is no doubt . . . that legal malpractice is cognized by the FTCA because Congress has prescribed special rules for FTCA claims relating to the malpractice of Department of Defense and Coast Guard lawyers, including an exemption of such claims from the FTCA's misrepresentation exception and a provision making the FTCA the exclusive remedy for such negligence."); *Sullivan v. U.S.*, 21 F.3d 198 (7th Cir. 1994) (exclusive remedy for legal malpractice claim against a federal public defender was action against the United States under the FTCA); *Mossow v. U.S.*, 989 F.2d 1365 (8th Cir. 1993) (FTCA claim for legal malpractice against U.S. Air Force attorney remanded for trial on the merits); *Preston v. U.S.*, 596 F.2d 232, 239 n. 10 (7th Cir. 1979) (distinguishing the justiciability of legal malpractice under the FTCA from the nonjusticiability of common law misrepresentation); *Matthews v. U.S.*, 456 F.2d 395 (5th Cir. 1972) (FTCA legal malpractice claim against Air Force legal personnel); *Knisley v. U.S.*, 817 F. Supp. 680 (S.D. Ohio 1993) (FTCA claim for legal malpractice against U.S. Army

28

Legal Assistance Officer); *Harz v. U.S.*, 711 F. Supp. 114 (S.D.N.Y. 1989) (FTCA claim for legal malpractice against Assistant United States Attorney).

60. "Under District of Columbia law, to prevail on a claim of legal malpractice, a plaintiff must establish the applicable standard of care, a breach of that standard, and a causal relationship between the violation and the harm complained of." *Biomet v. Finnegan Henderson LLP*, 967 A.2d 662, 664 (D.C. 2009) (citing *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982)).

61. Defendant Kelley owed Plaintiff a duty of care to render a legal opinion in a competent and accurate manner for two reasons – first, because he fomented an attorney-client relationship with Plaintiff and, second, because he provided legal counsel to Plaintiff with Plaintiff being the direct and intended beneficiary of such counsel. While Plaintiff did not seek or initiate contact with Defendant Kelley to seek his opinion or counsel regarding the applicability of the section 207(c) conflict of interest statute to Plaintiff's SCIO position, Kelley repeatedly contacted Plaintiff by both telephone and in writing to foist upon Plaintiff his erroneous legal opinion, accuse Plaintiff of violating section 207(c), and forbid Plaintiff from having any contact with the FBI counterintelligence Agents embedded in Plaintiff's office. Despite Plaintiff's repeated requests that Defendant Kelley provide a factual and legal basis for his opinion, none was forthcoming. By interloping into Plaintiff's post-employment affairs and affirmatively interposing his legal advice and counsel on Plaintiff, Defendant attorney Kelley owed Plaintiff a duty to work in Plaintiff's interest using a reasonable degree of knowledge, care, and skill. *See Biomet v. Finnegan Henderson, LLP*, 967 A.2d 662, 665 (D.C. 2009) (lawyer "owes" client "a duty to work in . . . [client's] interests using a reasonable degree of knowledge, care, and skill."); *Morrison v. MacNamara,* 407 A.2d 555, 561 (D.C.1979) ("[A] lawyer must exercise that degree of reasonable care and skill expected of lawyers acting under similar

29

circumstances."); *see also* D.C. R. Prof. Cond. R. 1.1(a) ("A lawyer shall provide competent representation to a client" and "[c]ompetent representation requires the legal knowledge, skill, *thoroughness,* and *preparation* reasonably necessary for the representation." (emphasis added)).

62. Even if Defendant Kelley's legal buttonholing of Plaintiff was somehow deemed insufficient to establish an attorney-client relationship, such privity is not required in this instance. "We may allow legal malpractice suits by third parties notwithstanding lack of privity where the impact upon the third party is 'not an indirect or collateral consequence' but the 'end aim of the transaction.'" *Scott v. Burgin*, 97 A.3d 564, 566 (D.C. 2014) (quoting *Needham v. Hamilton*, 459 A.2d 1060, 1061 (D.C. 1983)) (intended beneficiaries of estate may sue attorney who drafted the decedent's will notwithstanding the absence of an attorney-client relationship between the intended beneficiaries and the drafting lawyer). Here, Defendant Kelley's erroneous legal advice and counsel was loaded, aimed, and fired squarely at Plaintiff, not the United States government, the DOJ, the FBI or any other party. As the court in *Scott* explained, "[T]hird party claims [for legal malpractice] may be sustained where the plaintiffs were 'the direct and intended beneficiaries of the contracted for services.'" *Scott v. Burgin*, 97 A.3d 564, 566 (D.C. 2014) (quoting *Needham v. Hamilton*, 459 A.2d 1060, 1061 (D.C. 1983)).

63. In this case, the "contracted for services" were the ethics advice and legal counsel of Defendant Kelley and/or others while functioning as the FBI's or DOJ's "Designated Agency Ethics Officer." It is clear that Plaintiff was both the putative "client' and the intended beneficiary of such advice and counsel. In the 1978 enabling legislation establishing the Office of Government Ethics, the Senate noted that "[p]erhaps, most importantly, the Ethics Office [OGE] . . . bear[s] responsibility for conducting an on-going program to inform *employees* of those laws and regulations which govern their conduct." Ethics in Government Act of 1978,

30

Sen. Rep. No. 95-170, at 31 (1977), *reprinted in* 1978 U.S.C.C.A.N. 4216, 4247 (emphasis

added). In reauthorizing appropriations for the OGE in 1996, Congress listed OGE's first duty

as "*employee* education and counseling," emphasizing that one of OGE's principal obligations is

to "provide advice to outgoing government *employees* about negotiating for new jobs and post-

employment restrictions." Office of Government Ethics Authorization Act of 1996, H. R. Rep.

No. 104-595(I), at 1-2 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1356, 1356-57 (emphasis added).

In 1981, the OGE delegated much of its ethics advisory responsibility to individual executive

branch agencies, requiring that "[e]ach agency shall have a designated agency ethics official to

. . . coordinate and manage the agency's ethic's program." 5 C.F.R. § 2638.201. OGE expressly

mandated that these "designated agency ethics officials" "[c]ounsel . . . *former agency officials*

on post-employment conflict of interest statutes." 5 C.F.R. § 2638.202(b)(4) (emphasis added).

The DOJ Ethics Handbook implements this requirement by harkening to all employees: "[Y]ou

should always seek advice from an ethics official if are contemplating an action that you think

might be covered by these rules." http://www.justice.gov/jmd/ethics-handbook. Further

probative of Plaintiff's "direct and intended beneficiary" status is the grant of quasi-immunity

that the OGE has conferred on employees who rely on the legal advice of a designated agency

ethics official: "Disciplinary action for violating this part . . . will not be taken against an

employee who has engaged in conduct in good faith reliance upon the advice of an agency ethics

official." 5 C.F.R. § 2635.107(b). Accordingly, the legislative history, OGE implementing

regulations, and DOJ Ethics Handbook make plain that Defendant Kelley's duty as an FBI ethics

attorney ran directly and concurrently (if not first and foremost) to Plaintiff as a client or the

intended beneficiary of his counsel.

64. It is established law in the District of Columbia that an attorney is required to act "in good faith and upon informed judgement after undertaking reasonable research of the relevant legal principles and facts of the given case." *Biomet v. Finnegan Henderson, LLP*, 967 A.2d 662, 666 (D.C. 2009) (quoting *Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker*, 133 Idaho 1, 981 P.2d 236, 239-40 (1999)). The District of Columbia Rules of Professional Responsibility similarly explain: "Some important legal skills, such as the *analysis of precedent*, the *evaluation of evidence*, and *legal drafting*, are required in *all* legal problems." D.C. Rules of Prof'l Conduct R. 1.1 cmt. 2 (emphasis added). Moreover, "[c]ompetent handling of a particular matter includes *inquiry into and analysis of the factual and legal elements of the problem*, and use of methods and procedures meeting the standards of competent practitioners." D.C. Rules of Prof'l Conduct R. 1.1 cmt. 2 (emphasis added). Even the DOJ Ethics Office webpage admonishes that employees "should remember that certain [ethics] rules are complex and require *some analysis* in applying them to specific situations." http://www.justice.gov/jmd/ departmental-ethics-office (emphasis added).

65. In the instant case, Defendant Kelley failed to ascertain and apprise himself of the relevant facts as set forth in detail *supra* in this complaint. Defendant Kelley should have known of all facts stated in this complaint before rendering a legal opinion regarding the applicability of section 207(c) to Plaintiff's post-FBI employment as a DOE SCIO.

66. Defendant Kelley further breached his duty to identify and apply the relevant law, *to wit*:

67. Title 18, United States Code, Section 207(c) does not apply to a former employee's communications and appearances before his former agency when such communication or appearance is on behalf of the United States. 18 U.S.C. § 207(c). Defendant Kelley failed to

32

identify, discern, and apply this statutory exception in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

68. Title 18, United States Code, Section 207(c) does not apply to "acts done in carrying out official duties on behalf of the United States." 18 U.S.C. § 207(j)(1)(A). Defendant Kelley failed to identify, discern, and apply this statutory exception in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

69. "A former employee is not prohibited by any of the prohibitions of 18 USC 207 from engaging in any activity on behalf of the United States." 5 C.F.R. § 2641.301(a). Defendant Kelley failed to identify, discern, and apply this regulatory provision in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

70. The DOE Office of Intelligence and Counterintelligence is a member of the United States Intelligence Community. Exec. Order No. 12333 §§ 1.7(i), 1.12 (1981), *reprinted as amended in* 50 U.S.C. § 401 note (2006). Defendant Kelley failed to identify, discern, and apply this Executive Order provision in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

71. "Counterintelligence" is a "United States Intelligence Activity." Exec. Order 12333 § 1.4(b) (1981), *reprinted as amended in* 50 U.S.C. § 401 note (2006). Defendant Kelley failed to identify, discern, and apply this Executive Order provision in crafting and publishing his

33

erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

72. "The direction and control of counterintelligence operations" is an "inherently governmental function." FAR § 7.503(a)(8). Defendant Kelley failed to identify, discern, and apply this U.S. Treasury regulatory provision in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

73. According to the Director of the DOE Office of Counterintelligence, "SCIOs are the field commanders of DOE's national counterintelligence program" and SCIO's "authority to conduct counterintelligence investigations and inquiries is based on the federal authorities of DOE/IN and that their command accountability on investigative matters is to [DOE] IN-1." Memorandum for Department of Energy (DOE) Office of Intelligence and Counterintelligence (IN) from E. Bruce Held, Director and Charles K. Durant, Deputy Director, Subject: "Counterintelligence Roles and Responsibilities," dated May 11, 2012. Defendant Kelley failed to identify, discern, and apply this DOE directive in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

74. According to President Bill Clinton, "CI personnel assigned to the laboratories will have direct access to the laboratory director and will concurrently report to the Director [DOE] OCI." Presidential Decision Directive 61 at 2. Defendant Kelley failed to identify, discern, and apply this Presidential Decision Directive provision in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

75. According to the Office of Government Ethics, "a former employee engages in activities on behalf of the United States when he serves: (1) As a *representative of the United States* pursuant to *a specific agreement* with the United States to provide representational services to the United States . . . ." 5 C.F.R § 2641.301(a)(2)(ii). Defendant Kelley failed to identify, discern, and apply this OGE regulatory provision in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

76. According to the Attorney General of the United States, "DOE and *DOE contractor employees* shall conduct intelligence activities only in accordance with Executive Order 12333, applicable laws, other Executive orders, Presidential directives, DOE policy, and these procedures when acting *on behalf of a DOE Intelligence Component.*" Department of Energy Procedures for Intelligence Activities Approved by the Attorney General Under Executive Order 12333 (Oct. 19, 1992) at 25. Further, "[p]articipation on behalf of a DOE Intelligence Component may also occur when a DOE employee or *contractor employee* acts upon his own initiative but *for the benefit of that component.*" Department of Energy Procedures for Intelligence Activities Approved by the Attorney General Under Executive Order 12333 (Oct. 19, 1992) at 10 (emphasis added). Defendant Kelley failed to identify, discern, and apply these Attorney General Procedures in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

77. Section 811 of the Intelligence Authorization Act of 1995 requires DOE to report to the FBI any known or suspected compromise of classified information. Intelligence Authorization Act for Fiscal Year 1995, Pub. Law No. 103-359, 108 Stat. 3423 (1995). Defendant Kelley failed to identify, discern, and apply this statutory provision in crafting and

35

publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

78. Four Memoranda of Understanding between the FBI and DOE mandated the reciprocal sharing of counterintelligence and counterterrorism information and intelligence between the FBI field offices and the DOE counterintelligence field offices. 2002 FBI-DOE MOU; 2003 FBI-DOE; 2004 FBI-DOE MOU Addendum; and 2007 NJTTF MOU. Defendant Kelley failed to identify, discern, and apply these FBI-DOE MOU provisions in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

79. Section 207(j)(2) of Title 18, United Stated Code provides: "The restrictions contained in subsection (c) . . . shall *not* apply to acts done in carrying out official duties as an employee of . . . (B) an *accredited, degree granting institution of higher education . . . or a . . . medical research organization, exempted and defined under section 501(c)(3) of the Internal Revenue Code . . . .*" 18 U.S.C. § 207(j)(2)(A)-(B) (emphasis added). Defendant Kelley failed to identify, discern, and apply these statutory exceptions in crafting and publishing his erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c) while functioning as the ORFO SCIO.

80. In failing to gather the operative facts and undertake reasonable research of the relevant legal principles in this case, Defendant Kelley failed to exercise the skill and care commensurate with that generally afforded by other lawyers in similar matters, resulting in his issuance and publication of a grossly negligent and plainly erroneous legal opinion which violated the standard of care owed to Plaintiff under common law and the D.C. Rules of Professional Responsibility. As a direct and proximate cause of Defendant attorney Kelley's

36

gross negligence, Plaintiff was fired from Plaintiff's employment as the SCIO of DOE's ORFO. Plaintiff is currently perceived as a federal criminal and continues to suffer unemployment.

*Count II*

*Violation of the Federal Tort Claims Act – Professional Nonfeasance of Defendant Mueller*

81.  Paragraphs 1 through 80 are realleged and incorporated by reference herein.

82.  The President has mandated that "[e]ach agency head is directed to . . . [e]nsure that the rank, authority, *staffing* and resources of the Designated Agency Ethics Official are sufficient to ensure the effectiveness of the agency ethics program." Exec. Order No. 12731 § 301(e), *reprinted in* 55 Fed. Reg. 42,547, 42,549 (Oct. 17, 1990). Regulations promulgated by the Office of Government Ethics echo this mandate: "The head of each agency has primary responsibility for the administration of the 'ethics in government' program within his or her agency." 5 C.F.R. § 2638.102. Defendant former FBI Director Mueller breached his presidentially required duty to ensure the sufficiency of staffing of the office of the FBI's designated agency ethics official by failing to make certain that the "experience" of Defendant Kelley in "administrative, legal, managerial, or analytical work" demonstrated Defendant Kelley's ability to counsel Plaintiff regarding post-employment conflict of interest standards, as required by Title 5, Code of Federal Regulations, Section 2638.202(b)(4). While the mechanics of *how* Defendant Mueller might have executed these duties would have involved an element of judgment, the facts available demonstrate that his prescribed duty to ensure the office's staffing sufficiency by vetting Defendant Kelley's competency was shirked in its totality and wholly abdicated.

83.  So glaring and profound is the demonstrated legal incompetency of FBI attorney and designated agency ethics official Patrick Kelley that the FBI Director's failure to ensure his

37

suitability for the position is self-evident. Defendant Kelley's conduct reveals that he is abjectly

incapable of competently counseling departing and former agency officials on post-employment

conflict of interest standards. FBI Director Robert Mueller's failure to ensure Kelley's suitability

for the position, as required by the President and the OGE, resulted in Kelley's grossly negligent

and erroneous legal opinion which proximately caused the termination of Plaintiff's

employment, the branding of Plaintiff as a federal felon, and the ongoing unemployment of

Plaintiff.

## Count III

*Violation of the Federal Tort Claims Act - Negligent Failure to Train, Supervise and Advise by Defendant Attorney General Holder and Other Unknown, Unnamed Employees of the Department of Justice*

84. Paragraphs 1 through 83 are realleged and incorporated by reference herein.

85. According to Defendant General Holder:

> The [DOJ] Departmental Ethics Office, located in the Justice
> Management Division, is responsible for administering the
> Department-wide ethics program and for implementing
> Department-wide policies on ethics issues. The office provides
> *advice* and *training* directly to employees in the Department's
> Senior Management Offices . . . and *supervises* the ethics programs
> in the remaining Departmental components."

http://www.justice.gov/jmd/departmental-ethics-office (last visited Mar. 26, 2015) (emphasis

added). The foregoing facts demonstrate that Defendant General Holder and unknown and

unnamed officials within the DOJ Departmental Ethics Office failed to adequately train,

supervise and advise Defendant Mueller in his administration of the FBI's ethics program. Such

failure to adequately train, supervise and advise resulted in Defendant Mueller's breach of his

duty to sufficiently staff the office of the FBI's designated agency ethics official. This breach

occurred because Defendant Mueller failed to ensure that the experience of Defendant Kelley in

38

"administrative, legal, managerial, or analytical work" demonstrated Defendant Kelley's ability to counsel Plaintiff regarding post-employment conflict of interest standards as required by Title 5, Code of Federal Regulations, Section 2638.202(b)(4). General Holder and other unknown and unnamed officials within the DOJ likewise failed to adequately train, supervise, and advise Defendant Kelley to ensure that his legal conclusions were grounded in the analytical application of law to fact as required by the department's policy, the common law in the District of Columbia, and the D.C. Rules of Professional Responsibility cited *supra*. Defendants' failure resulted in Defendant Kelley's negligent issuance and dissemination of erroneous legal conjecture masquerading as legal opinion. As a direct and proximate cause, UT-Battelle, LLC terminated Plaintiff's employment as the Senior Counterintelligence Officer for the DOE Office of Intelligence and Counterintelligence in Oak Ridge, Tennessee, rendering Plaintiff unemployable and stigmatizing Plaintiff with the specter of illegal and unethical conduct.

*Count IV*

*Violation of the Privacy Act by Defendants FBI and DOJ*

86. Paragraphs 1 through 85 are realleged and incorporated by reference herein.

87. The Privacy Act states: "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." 5 U.S.C. § 552a(b). None of the exceptions to the disclosure prohibition applies here.

88. Plaintiff is informed and believes that Defendants FBI and DOJ (including the DOJ Office of the Inspector General) both maintain, with respect to the investigation of Plaintiff's alleged violation of 18 U.S.C. § 207(c), a "system of records" as defined by the Privacy Act, 5

39

U.S.C. § 552a(a)(5). This "system of records" includes "records," as defined by 5 U.S.C. § 552a(a)(4), pertaining to Plaintiff.

89. Both the FBI and the DOJ have intentionally and willfully disclosed "records" pertaining to Plaintiff from within their "systems of records" to other individuals and/or agencies (including but not limited to UT-Battelle, LLC; DOE, and current and former FBI employees) without Plaintiff's prior written consent or approval.

90. The FBI's and DOJ's intentional, willful, and unauthorized disclosures of records pertaining to Plaintiff have had adverse effects on Plaintiff. Defendants' unlawful disclosures resulted in Plaintiff's termination of employment as a Senior Counterintelligence Officer, eliminated Plaintiff's subsequent employment opportunities and ability to earn a living, irreparably damaged Plaintiff's personal and professional reputation, and caused Plaintiff extreme mental and emotional distress.

91. Defendants FBI and DOJ are sued, in their capacity as agencies, for actual damages sustained by Plaintiff and costs and reasonable attorneys' fees, as provided for in 5 U.S.C. § 552a(g)(4).

## Count V

*Constitutional Tort – Deprivation of Liberty without Due Process of Law
Pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971)*

92. Defendant Kelley's grossly negligent and erroneous legal opinion has destroyed Plaintiff's ability to obtain employment in the security and counterintelligence fields. "[T]he right to hold specific private employment and follow a chosen profession free from unreasonable government interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Greene v. McElroy*, 360 U.S. 474, 492 (1959). The "liberty" at issue in this case

40

is Plaintiff's "freedom to practice his chosen profession." *See Greene v. McElroy*, 360 U.S. at 492. "An individual has a liberty interest in employment protected by the Due Process Clause if the dismissal is 'for reasons that might seriously damage his standing in the community,' *Bollow v. Federal Reserve Bank*, 650 F.2d 1093, 1100 (9th Cir.1981), *cert. denied*, 455 U.S. 948 (1982), or if the dismissal effectively precludes future work in the individual's chosen profession." *Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir. 1987). As the U.S. Court of Appeals for the Sixth Circuit has noted, "a person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause . . . ." *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir.1989). By their erroneous legal opinion, Defendants Kelley, Mueller, Holder, and unknown, unnamed others set in motion a series of acts they knew or reasonably should have known would seriously damage Plaintiff's reputation, good name, honor, integrity, and standing in the community and effectively preclude Plaintiff from working in Plaintiff's chosen profession.

93. Plaintiff had a protected liberty interest in the freedom to practice his chosen profession. Plaintiff has located no law authorizing the Justice Department to create an agency ethics program under which affected private persons may lose their jobs and be restrained from following their chosen profession on the basis of legal determinations concerning their compliance with post-employment conflict of interest provisions whereby those private persons are denied the traditional procedural safeguards of confrontation and cross-examination. *See Greene v. McElroy*, 360 U.S. 474, 493 (1959). Simply stated, the Fifth Amendment Due Process Clause entitled Plaintiff to a meaningful hearing at a meaningful time to challenge the deprivation of Plaintiff's liberty interests by Defendant Kelley, Defendant Mueller, Defendant Holder and unknown, unnamed others. Plaintiff was not afforded such due process.

41

*Specificity of Plaintiff's Causes of Action*

94. To further crystalize the issues for the Court, this complaint does *not* include causes of action for libel, slander, misrepresentation, defamation, deceit, tortious interference with contract or any other intentional tort. Those torts are not alleged in this complaint nor should they be inferred or implied as causes of action. The bedrock of this complaint is the professional and legal malpractice of Defendant Kelley and other unknown, unnamed others in issuing and publicizing a grossly negligent and erroneous legal opinion that Plaintiff was violating Title 18, United States Code, Section 207(c); in the named and unnamed Defendants' dissemination of that opinion to others in violation of the Privacy Act; in the named and unnamed Defendants' failure to properly staff, train, supervise and advise Defendant Mueller and/or Defendant Kelley; and in the named and unnamed Defendants' deprivation of Plaintiff's constitutional liberty interests without due process of law. These causes of action and the injuries sustained by Plaintiff arise from the Defendants' failure to practice law with the requisite standard of care owed to Plaintiff and from their negligence *per se* in operating the DOJ and FBI ethics programs. Moreover, this complaint does not allege and should not be construed to allege that Plaintiff was injured due to commercial or financial decisions made by Plaintiff in reliance on any DOJ/FBI misrepresentations. As set forth *supra*, Plaintiff believes and avers that Defendants shirked, shunned and neglected their legal duties to Plaintiff due to their animus toward Plaintiff for Plaintiff's prior whistle blower reports. Such animus was the impetus for their legal and operational derelictions, not for any intentional or negligent misrepresentions which are not alleged causes of action in this complaint.

95. Plaintiff's use of the term "gross negligence" in this complaint refers to the generally

42

accepted meaning as found in Black's Law Dictionary: "materially more want of care than constitutes simple inadvertence;" "an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care;" "very great negligence;" "the want of even scant care;" and, "a heedless and palpable violation of legal duty respecting the rights of others." Black's Law Dictionary 931-932 (5th ed. 1979). Plaintiff uses "gross negligence" in this complaint because Defendants' inattention exceeds by a degree of magnitude that of ordinary negligence. Plaintiff's use of the term "gross negligence" is not intended and should not be construed to mean willful or intentional conduct in relation to Plaintiff's causes of action under the Federal Tort Claims Act.

## Prayer for Damages

96. Wherefore, Plaintiff respectfully requests that the Court:

A. Issue a declaratory judgment that Defendants' conduct as described above violated the Federal Tort Claims Act, the Privacy Act, and OGE, DOJ and FBI rules and regulations;

B. Issue a permanent injunction prohibiting Defendants from further violations of the Federal Tort Claims Act, the Privacy Act, and OGE, DOJ and FBI rules and regulations;

C. Award equitable relief to Plaintiff or other appropriate and reasonable orders, for the violations described above;

D. Award compensatory damages to Plaintiff in the amount of $2,496,211 for injuries sustained by Plaintiff due to Defendants' violations under the Federal Tort Claims Act;

E. Award reasonable and appropriate compensatory damages to Plaintiff, in an amount to be ascertained at trial, for Defendants' unlawful violation of the Privacy Act;

F. Award reasonable and appropriate compensatory damages to Plaintiff, in an amount to

43

be ascertained at trial, for Defendant Kelley's and other's deprivation of Plaintiff's constitutional liberty interests without due process of law.

G. Award exemplary and punitive damages to Plaintiff, in an amount to be ascertained at trial, to deter similar unlawful acts in the future;

H. Award Plaintiff his costs, expenses, and reasonable attorneys' fees; and

I. Award such other and further relief as the Court deems necessary and proper.

DATED: June 8, 2015

Respectfully submitted,

Richard L. Lambert
Plaintiff *Pro Se*
929 Gregg Road
Friendsville, Tennessee 37737
Phone: (865) 456-0039
E-mail: lambert0618@gmail.com

44